# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Tampa Division

**KENNETH P. WALKER,**

       **Plaintiff,**

v.
                               Civil Action No: __8:23-cv-211__

**TRANS UNION, LLC**
*Serve*: Corporation Service Company
       1201 Hays Street
       Tallahassee, FL 32301

**EQUIFAX INFORMATION SERVICES, LLC**
*Serve*: Corporation Service Company
       120 Hays Street
       Tallahassee, FL 32301

**EXPERIAN INFORMATION SOLUTIONS, INC.**
*Serve*: CT Corporation System
       1200 South Pine Island Road
       Plantation, FL 33324

**CITIBANK, N.A.**
*Serve*: Any Officer
       5800 S Corporate Pl
       Sioux Falls, SD 57108

       Defendants.

### <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

COMES NOW the Plaintiff, **KENNETH P. WALKER** (hereafter "Mr. Walker" or "Plaintiff"), by and through the undersigned Counsel, allege the following against Defendants, **TRANS UNION, LLC** (hereafter "Trans Union"), **EQUIFAX INFORMATION SERVICES, LLC** (hereafter "Equifax"), **EXPERIAN INFORMATION SOLUTIONS, INC.** (hereafter "Experian"), and **CITIBANK, N.A.** (hereafter "Citi"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Today in America there are three major consumer reporting agencies ("CRAs"), Defendants Trans Union, LLC, Equifax Information Services, LLC and Experian Information Solutions, Inc.

3. The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4. This requirement of reasonable procedures designed to ensure the maximum possible accuracy of information CRAs report is meaningful, and no mere formality. It is not enough for them to simply parrot information they receive from entities like Citi, particularly where a consumer makes a dispute about information reported.

5. When a consumer disputes information through the CRAs, those disputes are transmitted to the party furnishing the information, in this matter Defendant, Citi. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6. Plaintiff brings claims under Section 1681e(b) against all three CRAs because each reported inaccurate information about an account with Citi that did not belong to Mr. Walker. When Plaintiff disputed these inaccuracies, the CRAs did not reasonably investigate also violating 1681i.

7.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).  This is particularly true as to how these Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation.

8.     All CRA Defendants have been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct.  Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

9.     Likewise, Citi violated the FCRA, § 1681s-2(b), when it received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show that all Citi did was consult their own records about the account and confirm to the CRAs the inaccurate information they were already reporting.

## JURISDICTION AND VENUE

10.     The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 § U.S.C. 1331.

11.     Venue is proper in as a substantial part of the events giving rise to the claim occurred in this District and Division, and each of the Defendants regularly transacts business within this District.

## PARTIES

12.     The Plaintiff is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.     Trans Union is a limited liability company authorized to do business in the State of Florida through its registered agent in Tallahassee, Florida.

14.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

15.     Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

16.     Equifax is a limited liability company, authorized to do business in the State of Florida through its registered agent in Tallahassee, Florida.

17.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f), (hereinafter, a "CRA"). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.     Equifax disburses such consumer reports to third parties under contract for monetary compensation.

19.     Experian is a corporation, authorized to do business in the State of Florida through its registered agent located in Plantation, Florida.

20.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (hereinafter, a "CRA"). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

21.     Experian disburses such consumer reports to third parties under contract for monetary compensation.

22.     Citi is a national bank in the business of issuing and servicing credit card accounts to consumers nationwide.

23.     Citi is a "furnisher" as governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendants' Creditor-Customers*

24.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . .. In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

25.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke,* 2011 WL 1085874, at *4.

26.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329,  1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

27.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….

> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer.

> Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….

> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 709–10 (3d Cir. 2010).

28.     Section 1681i(a) on the other hand requires much more from a CRA after a

consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a
> consumer's file at a consumer reporting agency is disputed by the consumer and
> the consumer notifies the agency directly . . . of such dispute, the agency shall, free
> of charge, conduct a reasonable reinvestigation to determine whether the disputed
> information is inaccurate and record the current status of the disputed information,
> or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C.A. § 1681i(a)(1)(A).

29.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate

and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin*

*v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term

'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching

inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations

omitted).

30.     It has long been the law that a CRA, such as Equifax, Trans Union, or Experian,

does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by

merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt*, 805

F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to

contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols.,*

*Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-

LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No.

1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could

find that merely contacting [the creditor] was not sufficient to determine whether the disputed

information was inaccurate.")

31.     That "grave responsibility" imposed by the FCRA reinvestigation requirement" must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir.1997).     Accordingly,     "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

32.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

33.     Further, as the Defendants are aware, the Eastern District of Virginia has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

34.     Today, furnishers such as Citi, have their own independent duties under the FCRA, principally those found at 15 U.S.C. §1681s-2.  But while the Defendants' duties under §1681e(b) were enacted in 1970 and have governed since, Congress imposed duties on furnishers much more recently (in 1996).  THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### *The Theft of Plaintiff's Identity*

35.     On or about March 2022, Plaintiff's wife began receiving voicemails from Citi for her husband about a Citi credit card account. Upon investigation, and after numerous phone calls with Citi, Plaintiff discovered that he had been the victim of identity theft.

36.     On or about May 2022, Plaintiff received a letter from Citi demanding payment or the account was going to be referred to collections.

37.     Plaintiff never consented, knew about, or was aware of that an identity thief had opened a Citi credit card account in his name without his consent using Plaintiff's personal identifying information.

38.     Plaintiff did not receive any notices of delinquent accounts, payments, or charges for any of the accounts and liabilities the identity thief obtained using Plaintiff's personal identifying information, until the May 2022 collection letter from Citi.

39.     Plaintiff obtained copies of his credit reports from Trans Union, Equifax and Experian and discovered that a Citi credit card account had been opened without his consent on or about December 1, 2021. The account was reporting derogatorily as 90 – 119 days past due.

### *Plaintiff Disputes the Inaccuracies with The CRAs*

40.     On or about June 14, 2022, Plaintiff submitted dispute letters to Trans Union, Equifax and Experian via certified regarding the fraudulent and derogatory Citi account, on his credit files.

41.     On June 30, 2022, Equifax forwarded its dispute results to Plaintiff that advised Plaintiff that the Citi account had been verified as belonging to him.  The account was reporting derogatorily as 120 days past due.

42.     On July 9, Trans Union forwarded its Investigation Results to Plaintiff that advised that the Citi account had been updated.  Upon review the Plaintiff learned that the fraudulent Citi account was reporting derogatorily as 120 days past due.

43.     On July 14, 2022, Experian forwarded Plaintiff its Dispute Results.  Upon review Plaintiff learned that the account remained on his credit report, and was reporting a balance of $160.00.

44.     Trans Union, Equifax and Experian did not report that the Citi account was "in dispute" by the consumer.

### *The CRA Defendants Did Not and Do Not*
### *Conduct Any Investigation of Most Consumer Disputes*

45.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of Trans Union, Equifax and Experian to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas. Trans Union and Equifax use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

46.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[1]

47.     For Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes. Equifax then forwards the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India.

48.     The CRAs use low-wage employees to work quickly to process consumer dispute letters received, skimming the letters and selecting one or a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

49.     These dispute agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

50.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

---

[1] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Trans Union for its farming-out investigations to Teleperformance.

51. TransUnion and Equifax did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

52. Trans Union and Equifax have taken the position in other litigation that they lack control over Teleperformance. *See, e,g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that TransUnion did not have control or the ability to produce for deposition Indian employees of Intelenet); *Miller v. Equifax Info. Servs., LLC*, No. 4:19-cv-584-MW/MJR, ECF 54 (N.D. Fla. Oct. 27, 2020) ("[b]ecause Intelenet is not a corporate affiliate of Defendant and because the contract does not give Defendant the right to [compel] Intelenet's employee's presence for deposition, this Court finds that it cannot compel Defendant to produce the" dispute investigators). Regardless of whether these statements are correct, Trans Union, Equifax and Trans Union believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

53. The CRAs strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Trans Union, Equifax and Experian. It gets sent to Defendants' creditor customer, such as Citi, for its sole review and consideration.

54. Trans Union, Equifax and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

***The CRA Defendants Forwarded Plaintiff's***
***Disputes to Citi, Who Did Nothing***

55.     In each instance in which each Plaintiff disputed the Citi account with the CRAs, each forwarded Plaintiff's disputes to Citi using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to the CRA Defendants.

56.     e-Oscar is also the system by which Citi has agreed it will accept such consumer disputes from the CRAs.

57.     Under such circumstances, Citi became obligated under the FCRA to investigate Plaintiff's disputes.

58.     Plaintiff's disputes to Citi, made in an attempt to have them reinvestigate his complaints, went unanswered and the derogatory payment history continues to be reported in the Plaintiff's consumer file.

59.     Citi failed to reinvestigate Plaintiff's complaints.

60.     The information furnished by Citi to the CRA Defendants was at all times inaccurate.

61.     On or about a date better known to Defendants, Defendant CRAs furnished Plaintiff's disputes to Citi.

62.     Citibank failed to reasonably reinvestigate Plaintiff's disputes that it received from Trans Union, Equifax and Experian in violation of § 1681s-2(b)(1)(A) of the FCRA.

63.     Citi published the account without also including a notation that the account was in dispute and by failing to correctly report the results of an accurate investigation to Trans Union, Equifax and Experian in violation of 15 U.S.C. § 1681s-2(b)(C) and (D) of the FCRA

64.     Citi further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Defendant CRAs and prior to the commencement of this action.

65.     Defendant CRAs responded to Plaintiff's disputes, claiming the Citi account was verified as accurate and the information was updated. This response confirms that Defendant CRAs communicated Plaintiff's disputes to Citi.

***Plaintiff Suffered Actual Harm***

66.     Defendant CRAs continued to report the derogatory Citibank account on Plaintiff's credit reports, despite being notified that this information was false.

67.     Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

68.     As a result of the defamatory nature of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a.   Stress associated with being unable to correct the errors to have the fraudulent account removed from his credit file;

   b.   Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

   c.   Loss of time attempting to cure the error;

   d.   Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

   e.   Stress associated with attempting to resolve this matter in the last year.

*Defendants' Conduct Was Willful*

69.     The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

70.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va*., 526 F.3d 142, 151 (4th Cir. 2008).

71.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Trans Union, Equifax and Experian's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

72.     Trans Union, Equifax and Experian have received thousands of disputes and other complaints regarding the creditors at issue in this case-sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

73.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

74.     The CRAs knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor such consumer complaints.

75.     The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many

multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

76. Each Defendant regularly receives unredacted consumer dispute details from this database.

77. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

78. Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

79. Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Experian.

80. Further, over 33,000 of the CFPB complaints as to Experian and just shy of 38,000 against TransUnion were based largely on their failure to reasonably investigate consumer disputes.

81. Just in the last 12 months alone, Trans Union, Equifax and Experian have each been sued on by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that Trans Union, Equifax and Experian violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

82. While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put the CRAs on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

83.     Experian has had had actual notice from numerous other courts that its blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc*., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'").

84.     Trans Union has long been on even clearer notice. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a TransUnion case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). TransUnion's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

85.     The CRAs have repeatedly been criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

86.     In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).[2]

---

[2] *Available at* https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-s.

87.     The AG Settlement also required the CRA Defendants to conduct significant research and data gathering-even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

88.     The CRAs are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[3]

89.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

90.     Among many of the Defendants' accuracy failures, the NCLC Report discovered:

•   Insufficient Information Conveyed and Considered in Investigation. Credit bureaus use the highly automated e-OSCAR system to convey

---

[3] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- Failure to Transmit Information Submitted by the Consumer. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- Perfunctory Credit Bureau Investigations. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- Credit Bureaus Always Side with Furnishers. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

91. Just last year, the CFPB filed a lawsuit against TransUnion for violating a 2017 Consent Order enjoining it from engaging in deceptive marketing and cheating customers, and CFBP Director Rohit Chopra stated: "TransUnion is an out-of-control repeat offender that believes it is above the law. I am concerned that TransUnion's leadership is either unwilling or incapable of operating its businesses lawfully." *CFPB Charges TransUnion and Senior Executive John Danaher with Violating Law Enforcement Order* (Apr. 12, 2022), *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-charges-transunion-and-senior-executive-john-danaher-with-violating-law-enforcement-order/.

92. Like TransUnion, Defendant Citi has had actual notice of established law defining its duties under § 1681s-2(b). The leading case in this regard is the Fourth Circuit's decision, *Johnson v. MBNA Am. Bank, NA*. 357 F.3d 426 (4th Cir. 2004). *Johnson* and its progeny long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with

respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching inquiry," as opposed to a "superficial" one, "to determine whether the disputed information can be verified." *Johnson*, 357 F.3d at 430–31.

93.     This standard for an investigation requires more than a superficial data conformity check of verifying that the data contained in a furnisher's computer records is the same as that reported to the CRAs. In a decision adopting the Fourth Circuit's *Johnson* standard, the Court of Appeals for the Ninth Circuit explained:

> The Fourth Circuit's reasoning in *Johnson* is entirely persuasive. *By its ordinary meaning, an "investigation" requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute.* Moreover, like the Fourth Circuit, we have observed that "a primary purpose for the FCRA [is] to protect consumers against inaccurate and incomplete credit reporting." *Nelson*, 282 F.3d at 1060. *A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions, even where circumstances demanded a more thorough inquiry.*

*Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162–63 (9th Cir. 2009) (emphasis added).

94.     Citi also had actual knowledge of the Fourth Circuit's decision, *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 146–47 (4th Cir. 2008), as well as cases that thereafter adopted and followed it, which held that a furnisher that fails to report a debt it knows is disputed as disputed would violation § 1681s-2(b).

95.     Despite the notice, Citi has refused to change its dispute investigation process because it would cost too much money to do so.

96.     Despite the notice and judicial, regulatory and public interest criticism, the CRAs and furnishers like Citi have refused to change their dispute investigation process because it would cost too much money to do so.

97.     The CRA and Citi's procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### (Trans Union, Equifax and Experian)

98.     Plaintiff reincorporates each of the allegations in paragraphs 24, 25, 26, 27, 33, 66, 67, 68, 69, 70, 71, 72, 73, 74, and 75 into this Count as if set forth fully at length herein.

99.     Defendants Trans Union, Equifax and Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files they published and maintained concerning the Plaintiff.

100.    As a result of this conduct, action, and inaction of Trans Union, Equifax and Experian, the Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress

101.    The violations by Trans Union, Equifax and Experian were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Defendants are negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o.

102.    Plaintiff is entitled to recover costs and attorneys' fees from Trans Union, Equifax, and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II:
### VIOLATION OF THE FAIR CREDIT REPORTING ACT 15

103.    The Plaintiff reincorporates each of the allegations in paragraphs 24, 28, 29, 30, 31, 32, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46. 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96 and 97 into this Count as if set forth at length herein.

104.    Trans Union, Equifax, and Experian violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from the Plaintiff's credit files.

105.    Trans Union, Equifax, and Experian each violated 15 U.S.C. §1681i(a)(4) by failing to consider all relevant information submitted by Plaintiff.

106.    Trans Union, Equifax and Experian each violated 15 U.S.C. §1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

107.    As a result of Trans Union, Experian, and Equifax's violations of 15 U.S.C. § 1681i(a), the Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

108.    The violations by Trans Union, Equifax and Experian were willful rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Trans Union, Equifax and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681n.  In the alternative, Trans Union, Equifax and Experian were negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

109.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Trans Union, Equifax and Experian in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT III:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681s-2(b)(1)(A) and (B)
## (Citi)

110.     The Plaintiff reincorporates each of the allegations in paragraphs 34, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 94, 95, 96 and 97 into this Count as if set forth at length herein.

111.     On one or more occasions within the past two years, by example only and without limitation, Citi violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes.

112.     On one or more occasions within the past two years, by example only and without limitation, Citi violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the CRAs.

113.     Based on the manner in which the CRAs responded to – or did not respond to Plaintiff's disputes, representing that Citi had "verified" the supposed accuracy of its reporting, Plaintiff alleges Trans Union, Equifax and Experian did in fact forward the Plaintiff's dispute via an ACDV to Citi.

114.     Citi understood the nature of Plaintiff's disputes when it received the ACDVs from Trans Union, Equifax and Experian.

115.     Notwithstanding the above, Citi follows a standard and systemically unlawful process when it receives the ACDV dispute.  Basically, Citi only reviews its own internal computer screens for the account and repeat back to the ACDV system the same information it already has reported to the CRAs.

116.     When Citi receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether or not the information already in its computer system is itself accurate.

117.     As a result of Citi's violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

118.     Citi's FCRA violations were willful rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Citi was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

119.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Citi in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT IV:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681s-2(b)(1)(C) and (D)
## (Citi)

120.     The reincorporates each of the allegations in paragraphs 34, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 94, 95, 96 and 97 into this Count as if set forth at length herein.

121.     On one or more occasions within the past two years, by example only and without limitation, Citi violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing false information within the Plaintiff's credit files in response to his disputes without also including a notation that the account was disputed and by failing to correctly report the results of accurate investigation to the Defendant CRAs.

122.     Citi "verified" to the CRAs the supposed accuracy of its reporting but failed to include the notation in the Plaintiff's consumer file that the account was "in dispute".

123. As a result of Citi's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

124. Citi's FCRA violations were willful rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Citi was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

125. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Citi in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT IV:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681s-2(b)(1)(E)
## (Citi)

126. The Plaintiff reincorporates each of the allegations in paragraphs 34, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 94, 95, 96 and 97 into this Count as if set forth at length herein.

127. Citi violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's dispute from Defendant CRAs and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Citi's failure to investigate as articulated herein, after Citi received notice of Plaintiff's dispute from the CRAs.

128. As a result of this conduct, action and inaction of Citi, the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

129. Citi's FCRA violations were willful rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Citi was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

130. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Citi in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment and actual, statutory, and punitive damages against Defendants, jointly and severally; for his attorneys' fees and costs; for pre-judgment and post-judgment interest at the legal rate, specific performance and injunctive relief, and such other relief the Court does deem just and proper.

Respectfully submitted,

**KENNETH P. WALKER**

By: ___/s/ *Craig C. Marchiando*___
Craig C. Marchiando, Florida Bar #1010769
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email: craig@clalegal.com

Drew D. Sarrett, VSB #81658 *(Pro Hac Vice forthcoming)*
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, VA 23219
(804) 905-9900 - Telephone
(757)930-3662 - Facsimile
Email: drew@clalegal.com


*Counsel for Plaintiff*